NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JOHN BRANDT,                     :
                                 :    Civil Action No. 10-1035 (DMC)
            Petitioner,          :
                                 :
      v.                         :    OPINION
                                 :
TERESA MCQUAIDE, et al.,         :
                                 :
            Respondents.         :


APPEARANCES:

Counsel for Petitioner[1]          Counsel for Respondents
Kit Applegate                      Catherine Antoine Foddai
53 Oxford Circle                   Bergen Co. Prosecutor's Off.
Southampton, NJ  08088             Bergen Co. Justice Center
                                   10 Main Street
                                   Hackensack, NJ 07601


CAVANAUGH, District Judge

     Petitioner John Brandt, a Krol[2] patient currently confined

at Anne Klein Forensic Center in West Trenton, New Jersey, has

submitted a petition for a writ of habeas corpus pursuant to 28

_____

     [1] Counsel for Petitioner entered her appearance after the
Respondents' Answer had been filed.

     [2] See State v. Krol, 68 N.J. 236 (1975) (detailing periodic
review procedures for persons found not guilty by reason of
insanity and committed for mental health treatment); N.J.S.A.
2C:4-8(b)(3) ("If the court finds that the defendant cannot be
released with or without supervision or conditions without posing
a danger to the community or to himself, it shall commit the
defendant to a mental health facility approved for this purpose
by the Commissioner of Human Services to be treated as a person
civilly committed.").

U.S.C. § 2254. The respondents are Teresa McQuaide and the

Attorney General of the State of New Jersey.

For the reasons stated herein, the Petition must be denied.

I.   BACKGROUND

The relevant facts are set forth in the opinion of the

Superior Court of New Jersey, Appellate Division.[3]

> The following facts are pertinent to our review.
> In 2001, two Bergen County indictments were returned
> against J.B. charging him in Indictment 01-06-1754 for
> third-degree burglary, N.J.S.A. 2C:18-2a, and third-
> degree criminal mischief, N.J.S.A. 2C:17-3a(1), and in
> Indictment 01-06-0156 for fourth-degree criminal
> trespass, N.J.S.A. 2C:18-3a. The charges arose out of
> J.B.'s entry into the college dormitory room of his
> girlfriend and her roommate without their permission.
> In their presence, he knocked over a bed and threw a
> television and stereo out of the window. Police
> officers who later apprehended J.B. saw that he had cut
> his wrists in an apparent suicide attempt.
>
> J.B. was subsequently diagnosed with bipolar
> disorder, manic type with psychotic features, and with
> an antisocial personality disorder. On June 24, 2003,
> the trial judge found him competent to stand trial on
> both indictments and not guilty by reason of insanity.
> . . .
>
> . . . The judge entered [the proposed order] on
> June 30, 2003, involuntarily committing J.B. to a
> psychiatric hospital and placing him on Krol status.
> . . .

_____

[3] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding
instituted by an application for a writ of habeas corpus by a
person in custody pursuant to the judgment of a State court, a
determination of a factual issue made by a State court shall be
presumed to be correct. The applicant shall have the burden of
rebutting the presumption of correctness by clear and convincing
evidence."

J.B.'s commitment was continued through periodic review orders issued by the judge on March 19 and June 23, 2004, which we affirmed.  I/M/O the Commitment of J.B., No. A-4456-03 (App. Div. February 24, 2005). Thereafter, another judge held periodic Krol hearings and continued J.B.'s commitment. ...

A Krol hearing occurred on April 30 and September 28, 2007.  The State's expert and J.B.'s treating psychiatrist, Mahmood Ghahramani, M.D., testified that J.B. has a long history of violent and assaultive behavior and non-compliance with medication.  He is also an escape risk.[Fn2] The doctor noted that J.B. had been admitted to Ancora Psychiatric Hospital, but was transferred to the Ann Klein Forensic Center (Ann Klein) after assaulting his then treating psychiatrist. J.B. did not assume responsibility for the assault and blamed the doctor.

[FN2] J.B. was once placed at the less restrictive Greystone Park and attempted to escape.

Dr. Ghahramani opined that J.B. has bipolar disorder, which is a lifelong problem that can go under remission with antipsychotic medication.  J.B. also has an antisocial personality disorder with antisocial features and borderline qualities.  Because J.B. was then on medication, the doctor opined that he was currently "under fair remission other than some mild symptoms of bipolar disorder[,] which is ... pressured speech, and grandiosity still is there but his overall behavior is not overtly psychotic or manic."  However, the doctor emphasized that if J.B. is under stress or stops taking his medication, he is "a very high risk for decompensation and acting out behavior, violent ... [and] more impulsive."  The doctor also testified that:

I agree that Axis II [anti-social personality disorder] is the more serious problem.  If [J.B.] actually was just, had the bipolar disorder, and had a good insight into his problem, would take his medication ... and [J.B.] has been quite resistant in the past to continue taking his medication and he has a pile of lawsuits against the doctors that they gave him medication, and so that also makes kind of high risk of his compliance with the treatment.

3

. . .

That Axis II treatment is very difficult,
very difficult, would be very long term.  I don't
know if just the problem of Axis II he had to
remain in [a] psychiatric hospital for treatment
of his Axis II problem but in general, at the
present time [J.B.] needs the structure of the
hospital besides the treatment and to safeguard
the risk of violent behavior.

Dr. Ghahramani concluded that J.B.'s diagnosis,
along with his psychiatric history, risk of violent
behavior, dangerous acting out, and non-compliance with
medication, make him a potential danger to himself and
others.  The doctor also concluded that J.B. should be
continued at Ann Klein, not a less restrictive setting,
because he could not maintain himself in a less
restrictive setting.

J.B.'s expert, Daniel P. Greenfield, M.D.,
evaluated J.B. once prior to the hearing for
approximately five hours.  He also reviewed J.B.'s
medical records and other documents.  He acknowledged
that the documents reveal that J.B. had been
institutionalized and had received psychiatric
treatment at various times since the age of twelve for
acting out behaviors.  J.B. also may have had attention
deficit hyperactivity disorder, childhood bipolar
disorder, and anti-social personality disorder.
Nonetheless, the doctor opined that J.B. only has an
Axis I diagnosis of polysubstance abuse in
institutional remission, and an Axis II diagnosis of
antisocial personality disorder.  He concluded that
J.B. does not have an Axis I diagnosis of bipolar
disorder and that without an Axis I diagnosis, there
was no clinical reason for J.B.'s commitment to a
psychiatric institution.

On cross-examination, Dr. Greenfield conceded that
J.B. has been manipulative and that because of his
behaviors there was no reasonable likelihood that he
would change; that J.B. does not want to take
medication; that J.B. is always going to have the
"propensity to act out and to try to act out in a
potentially dangerous way against society and needs to
be contained for that reason[;]"[FN3] and that J.B.

4

poses a danger to himself and others by virtue of his behvaiors.

[FN3] The doctor stated that such confinement should be prison rather than a psychiatric institution.

At the conclusion of the hearing, the judge found as follows:

First and foremost I place greater weight on Dr. Ghahramani's testimony and analysis than that of Dr. Greenfield. I find that it was Dr. Ghahramani's professional opinion, a summary of his findings and recommendations based on a reasonable medical certainty that [J.B.] has been suffering and continues to suffer from an emotional condition known as a bipolar disorder. He continues to say at some point in his recommendation, findings and recommendations, that [J.B.] is both manipulative and continues to be manipulative, has not benefitted from treatment.

The treatment team feels that he continues to be a high risk if he is to be transferred to a less restrictive setting.

The recommendation of Dr. Ghahramani is that [J.B.'s commitment e continued and case reviewed at a later time.

Now, although I place greater weight on Dr. Ghahramani's testimony than that of Dr. Greenfield, Dr. Greenfield today says that [J.B.] is in need of psychotherapy and containment. He does say [J.B.] will always have the propensity to act out against society according to my notes, that he's been in treatment sometime since his teenage years, just after the age of twelve, and I starred my notes when he said it.

Dr. Greenfield says [J.B.'s] acting out is a danger to himself and others.

[Dr. Greenfield] further testifies that bipolar diagnosis never goes away. It [] occasionally may be in remission. And although

>           Dr. Greenfield does not feel [J.B.] is presently
>           exhibiting any bipolar symptoms, he doesn't feel
>           he is bipolar, Dr. Ghahramani does and I place
>           greater weight in Dr. Ghahramani's testimony.
>
>           I do find there is an Axis I diagnosis and I
>           find from what Dr. Greenfield says that bipolar
>           diagnosis never goes away.  Although it may be in
>           remission.
>
>           I find that [J.B.] is a danger to himself and
>           others and I will continue the commitment as it is
>           presently constituted and I'm going to ask for a
>           review six months from today which will be March
>           28, 2008 at 1:45 in this courtroom.
>
>      The judge entered the October 12, 2007 order
> continuing J.B.'s commitment.

(Opinion of Appellate Division at 2-9 (June 16, 2009).)

On June 16, 2009, the Appellate Division affirmed the commitment order.  On October 23, 2009, the Supreme Court of New Jersey denied certification.  In re Commitment of J.B., 200 N.J. 476 (2009).

This Petition followed.  Here, Petitioner contends that his continued commitment is unconstitutional because (1) there was not sufficient evidence that he was presently suffering from an active mental illness and (2) there was not sufficient evidence that he was dangerous because of a mental illness.  (Petition, ¶ 12.)  Briefing is now complete and this matter is ready for decision.

II.   28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty

Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent

part:

> (a) The Supreme Court, a Justice thereof, a circuit
> judge, or a district court shall entertain an
> application for a writ of habeas corpus in behalf of a
> person in custody pursuant to the judgment of a State
> court only on the ground that he is in custody in
> violation of the Constitution or laws or treaties of
> the United States.

With respect to any claim adjudicated on the merits in state

court proceedings, the writ shall not issue unless the

adjudication of the claim

> (1) resulted in a decision that was contrary to,
> or involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme
> Court of the United States; or

> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court

precedent "if the state court applies a rule that contradicts the

governing law set forth in [Supreme Court] cases," or "if the

state court confronts a set of facts that are materially

indistinguishable from a decision of th[e] Court and nevertheless

arrives at a result different from [the Court's] precedent."

Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J.,

for the Court, Part II).  A state court decision "involve[s] an

7

unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). <u>Id.</u> at 407-09.   To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. <u>Id.</u> at 409.   In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. <u>Matteo v. Superintendent</u>, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference. <u>Chadwick v. Janecka</u>, 302 F.3d 107, 116 (3d Cir. 2002) (<u>citing</u> <u>Weeks v. Angelone</u>, 528 U.S. 225, 237 (2000)).   With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment. <u>See</u> <u>Hameen v. State of Delaware</u>, 212 F.3d 226, 248 (3d Cir. 2000), <u>cert. denied</u>, 532 U.S. 924 (2001); <u>Purnell v. Hendricks</u>, 2000 WL

1523144, *6 n.4 (D.N.J. 2000).  See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).  In such instances, "the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001) (citing McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999)).  "However, § 2254(e)(1) still mandates that the state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence." Simmons v. Beard, 581 F.3d 158, 165 (3d Cir. 2009).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies.  See 28 U.S.C. § 2254(b)(2); Lambert v.

9

Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v.
Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent
standards than more formal pleadings drafted by lawyers.  Estelle
v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S.
519, 520 (1972).  A pro se habeas petition and any supporting
submissions must be construed liberally and with a measure of
tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998);
Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989);
United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969),
cert. denied, 399 U.S. 912 (1970).

III.  CIVIL COMMITMENT IN NEW JERSEY

The State of New Jersey has made certain findings regarding
the need for treatment of mentally ill individuals.

The Legislature finds and declares that:

a. The State is responsible for providing care,
treatment and rehabilitation services to mentally ill
persons who are disabled and cannot provide basic care
for themselves or who are dangerous to themselves,
others or property; and because some of these mentally
ill persons do not seek treatment or are not able to
benefit from voluntary treatment provided on an
outpatient basis, it is necessary that State law
provide for the voluntary admission and the involuntary
commitment to treatment of these persons as well as for
the public services and facilities necessary to fulfill
these responsibilities.

b. Because involuntary commitment to treatment entails
certain deprivations of liberty, it is necessary that
State law balance the basic value of liberty with the
need for safety and treatment, a balance that is
difficult to effect because of the limited ability to

10

predict behavior; and, therefore, it is necessary that
State law provide clear standards and procedural
safeguards that ensure that only those persons who are
dangerous to themselves, others or property, are
involuntarily committed to treatment.

N.J.S.A. 30:4-27.1.

Accordingly, the State of New Jersey has enacted a civil
commitment scheme applicable, _inter_ _alia_, to persons who have
been found not guilty of crimes by reason of insanity.  More
specifically, upon entry of such a judgment, the court shall
order that the defendant undergo a psychiatric examination by a
psychiatrist of the prosecutor's choice.  N.J.S.A. 2C:4-8a.
Thereafter, the trial court shall dispose of the defendant as
follows:

    (1) If the court finds that the defendant may be
    released without danger to the community or himself
    without supervision, the court shall so release the
    defendant; or

    (2) If the court finds that the defendant may be
    released without danger to the community or to himself
    under supervision or under conditions, the court shall
    so order; or

    (3) If the court finds that the defendant cannot be
    released with or without supervision or conditions
    without posing a danger to the community or to himself,
    it shall commit the defendant to a mental health
    facility approved for this purpose by the Commissioner
    of Human Services to be treated as a person civilly
    committed.  In all proceedings conducted pursuant to
    this section and pursuant to section N.J.S. 2C:4-6
    concerning a defendant who lacks the fitness to
    proceed, including any periodic review proceeding, the
    prosecuting attorney shall have the right to appear and
    be heard.  The defendant's continued commitment, under
    the law governing civil commitment, shall be
    established by a preponderance of the evidence, during

the maximum period of imprisonment that could have been
imposed, as an ordinary term of imprisonment, for any
charge on which the defendant has been acquitted by
reason of insanity. ...

N.J.S.A. 2C:4-8b (emphasis added).

Under the law governing civil commitment, the state may
involuntarily commit persons found to be "in need of involuntary
commitment" following a judicial procedure. See N.J.S.A. 30:4-
27.1 et seq. "'In need of involuntary commitment' or 'in need of
involuntary commitment to treatment' means that an adult with
mental illness, whose mental illness causes the person to be
dangerous to self or dangerous to others or property and who ...
needs outpatient treatment or inpatient care ....'" N.J.S.A.
30:4-27.2m.

"'Mental illness' means a current, substantial disturbance
of thought, mood, perception or orientation which significantly
impairs judgment, capacity to control behavior or capacity to
recognize reality, but does not include simple alcohol
intoxication, transitory reaction to drug ingestion, organic
brain syndrome or developmental disability unless it results in
the severity of impairment described herein.  The term mental
illness is not limited to 'psychosis' or 'active psychosis,' but
shall include all conditions that result in the severity of
impairment described above." N.J.S.A. 30:4-27.2r.

"'Dangerous to self' means that by reason of mental illness
the person has threatened or attempted suicide or serious bodily

harm, or has behaved in such a manner as to indicate that the person is unable to satisfy his need for nourishment, essential medical care or shelter, so that it is probable that substantial bodily injury, serious physical harm or death will result within the reasonably foreseeable future; however, no person shall be deemed to be unable to satisfy his need for nourishment, essential medical care or shelter if he is able to satisfy such needs with the supervision and assistance of others who are willing and available.  This determination shall take into account a person's history, recent behavior and any recent act, threat or serious psychiatric deterioration."  N.J.S.A. 30:4-27.2h.

"'Dangerous to others or property' means that by reason of mental illness there is a substantial likelihood that the person will inflict serious bodily harm upon another person or cause serious property damage within the reasonably foreseeable future. This determination shall take into account a person's history, recent behavior and any recent act, threat or serious psychiatric deterioration."  N.J.S.A. 30:4-27.2i.

A person committed following a finding of not guilty by reason of insanity is entitled to period review hearings and to release upon a finding that he is no longer mentally ill and dangerous.  See generally State v. Krol, 68 N.J. 236 (1975).

13

IV.   <u>ANALYSIS</u>

Here, Petitioner contends that his continued commitment is unconstitutional because (1) there was not sufficient evidence that he was presently suffering from an active mental illness and (2) there was not sufficient evidence that he was dangerous <u>because of</u> a mental illness.   (Petition, ¶ 12.)[4]

The Appellate Division rejected these claims on direct appeal.

> J.B. first contends that the court should have terminated his <u>Krol</u> status because the State failed to prove that he currently suffers from any active mental illness.   He points to Dr. Ghahramani's testimony that he does not currently display overtly psychotic or manic behavior, that his symptoms are milk, and that his condition is now in remission and does not currently fit the criteria of an individual who could be civilly committed under state law.   He also points to Dr. Greenfield's testimony that he does not have bipolar disorder and does not require commitment. Alternatively, he seeks placement in a less restrictive environment.[FN4]

> > [FN4] J.B. was on level one supervision at the time of the hearing, which is the most restrictive level of supervision.

> . . .

---

[4] In the Reply brief submitted by Petitioner's counsel, it is argued that there are three claims presented, including a claim that the state court violated Petitioner's rights under the Equal Protection Clause by applying a different commitment standard for <u>Krol</u> patients as opposed to other civil committees, in that the state court committed Petitioner solely on the basis of dangerousness.   This claim was not asserted in the Petition, was not exhausted in state court, and will not be considered here.   In any event, the claim is patently meritless.

"'When a person accused of a crime is acquitted by reason of insanity, the accused may be held in continued confinement if the person is a danger to self or others and is in need of medical treatment." ... The State must show by a preponderance of the evidence that the defendant is mentally ill and poses a danger to himself or society. Krol, supra, 68 N.J. at 257. "Krol established the procedures for determining the length of commitment for a person who has been acquitted by reason of insanity." ... "'Commitment requires that there be a substantial risk of dangerous conduct within the reasonably foreseeable future. Evaluation of the magnitude of the risk involves consideration both of the likelihood of dangerous conduct and the seriousness of the harm which may ensue if such conduct takes place.'" ... The focus is on whether the defendant "presently poses a significant threat of harm either to himself or others."

"'After the defendant is committed, periodic review hearings (Krol hearings) are held in a criminal proceeding on notice to the prosecutor to determine if continued involuntary commitment is warranted.'" ... During the Krol hearings, the State must establish the need for continued commitment by the preponderance of the evidence. ... These hearings will continue "'during the maximum period for which imprisonment could have been imposed as an ordinary term of imprisonment for the charges on which the defendant has been acquitted by reason of insanity, after giving credit for all time spent in confinement for the charges.'" ...

"The continued involuntary commitment of an NGI defendant is based upon the court's determination of whether the State has demonstrated that the defendant continues to be a danger to [him]self or others." ... "[A] Krol status defendant may remain committed for longer than the ordinary maximum term if the court finds that [he] remains a danger to [him]self or others." ...

The determination of "dangerousness" is "'a legal one, not a medical one.'" ...

The standard is "dangerous to self or society." Dangerous conduct is not identical with criminal conduct. Dangerous conduct involves not

15

merely violation of social norms enforced by
criminal sanctions, but significant physical or
psychological injury to persons or substantial
destruction of property.  Persons are not to be
indefinitely incarcerated because they present a
risk of future conduct which is merely socially
undesirable.  Personal liberty and autonomy are of
too great value to be sacrificed to protect
society against the possibility of future behavior
which some may find odd, disagreeable, or
offensive, or even against the possibility of
future non-dangerous acts which would be ground
for criminal prosecution if actually committed.
Unlike inanimate objects, people cannot be
suppressed simply because they may become public
nuisances.

[Krol, supra, 68 N.J. at 259-60.]

There must be a "substantial risk of dangerous
conduct within the reasonably foreseeable future."  Id.
at 260.  Ultimately, the "[d]etermination of
dangerousness involves prediction of defendant's future
conduct rather than mere characterization of his past
conduct.  Nonetheless, defendant's past conduct is
important evidence as to his probable future conduct."
Id. at 260-61.  The final determination of
dangerousness requires a "delicate balancing of
society's interest in protection from harmful conduct
against the individual's interest in personal liberty
and autonomy."  Id. at 261.

Based upon our careful review, we are satisfied
that the record amply supports the judge's factual and
credibility findings, and his conclusion that J.B.
continues to be a danger to himself and others and
should remain involuntarily committed.  We are also
satisfied that the record amply supports J.B.'s
continued confinement in a more restrictive placement.

(Opinion of Appellate Division at 10-15 (June 16, 2009)

(citations omitted).

Certainly, civil commitment represents a profound loss of

personal liberty that requires both substantive and procedural

16

due process protection.  See, e.g., Parham v. J.R., 442 U.S. 584
(1979); Jackson v. Indiana, 406 U.S. 715 (1972).  Nevertheless,
"that liberty interest is not absolute."  Kansas v. Hendricks,
521 U.S. 346, 356 (1997).

   The Supreme Court of the United States has recognized that
states have a legitimate interest under their parens patriae
powers in providing care to their citizens who are unable because
of emotional disorders to care for themselves; the states also
have authority under their police power to protect the community
from the dangerous tendencies of those who are mentally ill.
Addington v. Texas, 441 U.S. 418 (1979).  Generally, states bear
the burden of proving mental illness and dangerousness by clear
and convincing evidence.  Id.

   In the case of persons acquitted of criminal acts by reason
of insanity, however, the verdict establishes two facts: (1) the
defendant committed an act that constitutes a criminal offense,
and (2) he committed the act because of mental illness.  See
Jones v. United States, 463 U.S. 354, 363-64 (1983).  Thus, the
verdict establishes "dangerousness" beyond a reasonable doubt;
the verdict is also sufficient to permit an inference of
continuing mental illness, so long as there is timely review of
that issue.  Id. at 364-66.  Therefore, "a finding of not guilty
by reason of insanity is a sufficient foundation for commitment

17

of an insanity acquittee for the purposes of treatment and the
protection of society." Id. at 366.

Moreover, the differences between insanity acquittees and
ordinary members of the public justify a different standard of
proof in commitment of insanity acquittees. Jones v. United
States, 463 U.S. at 366-67. Because of concern that members of
the public could be confined on the basis of "some abnormal
behavior which might be perceived by some as symptomatic of a
mental or emotional disorder, but which is in fact within a range
of conduct that is generally acceptable," the Court in Addington
v. Texas held that civil requirement of such ordinary members of
the public required proof by clear and convincing evidence.
Addington, 441 U.S. at 426-27. By contrast, where automatic
commitment follows only if the acquittee himself has advanced
insanity as a defense and has proven that his criminal act was a
product of his mental illness, there is good reason for a
diminished "preponderance of the evidence" standard of proof for
civil commitment of insanity acquittees. Jones, 463 U.S. at 367-
68 (citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)("due
process is flexible and calls for such procedural protections as
the particular situation demands").

> We hold that when a criminal defendant establishes by a
> preponderance of the evidence that he is not guilty of
> a crime by reason of insanity, the Constitution permits
> the Government, on the basis of the insanity judgment,
> to confine him to a mental institution until such time
> as he has regained his sanity or is no longer a danger

18

> to himself or society.  This holding accords with the
> widely and reasonably held view that insanity
> acquittees constitute a special class that should be
> treated differently from other candidates for
> commitment.

Jones, 463 U.S. at 370.

Where an insanity committee is no longer mentally ill,

however, he may not be confined solely because he is deemed

dangerous.  Foucha v. Louisiana, 504 U.S. 71 (1991).

Here, the government of New Jersey provided competent

factual and expert evidence that Petitioner suffers from bipolar

disorder, that bipolar disorder is a lifelong condition, that

Petitioner's mental illness is controlled only when he is taking

anti-psychotic medication and that he has a history of refusing

to take his medication, that he does not have good insight into

his disease or the need to continue to take his medication, that

his condition is complicated by other diagnoses including

personality disorder and polysubstance abuse (currently in

institutional remission), that the combination of mental health

problems make him a very high risk to cease taking his medication

and to be a danger to himself and others.

It is specious to suggest that there was not sufficient

evidence to establish both that Petitioner currently suffers from

a mental illness and that that mental illness causes him to be

dangerous.  The decisions of the state courts are neither

contrary to nor an unreasonable application of controlling

Supreme Court precedent.   Nor are the state court decisions based on unreasonable determinations of fact in light of the evidence presented.   Petitioner is not entitled to habeas relief. Cf. U.S. v. S.A., 129 F.3d 995 (8th Cir. 1997) (involving civil commitment under 18 U.S.C. § 4246) (history of violent behavior coupled with reluctance to continue taking medication is sufficient to establish dangerousness; also, while the government's expert did not directly testify that the patient's mental illness "caused" his violent behavior, the statement that the patient's condition was a "significant factor" contributing to his violent behavior was more than sufficient to support a finding that the patient's dangerousness was a result of his mental illness).

IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate

to deserve encouragement to proceed further." Miller-El v.
Cockrell, 537 U.S. 322, 327 (2003).

Here, jurists of reason would not disagree with this Court's
decision that Petitioner has failed to make a substantial showing
of the denial of a constitutional right.  No certificate of
appealability shall issue.

V.   CONCLUSION

For the reasons set forth above, the Petition will be
denied.  An appropriate order follows.

Dennis M. Cavanaugh
United States District Judge

Dated: 12/20/10

21